IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SCOTT JEFFERSON FOX RICHEY                                    PLAINTIFF

v.                          Civil No. 05-5162

DR. NEIL MULLINS; and
SHERIFF KEITH FERGUSON                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the undersigned for report and recommendation is the defendants' motion for summary judgment motion (Doc. 20). To assist plaintiff in responding to the summary judgment motion, a questionnaire was propounded to the plaintiff (Doc. 23). Plaintiff's response to the questionnaire was filed as his response to the summary judgment motion (Doc. 24).

Plaintiff contends his constitutional rights were violated while he was incarcerated at the Benton County Detention Center (BCDC). Specifically, he contends: (1) he was denied adequate medical care; (2) his right to medical privacy was violated; and (3) the grievance procedure was inadequate.

## BACKGROUND

On July 11, 2005, Scott Jefferson Fox Richey[1] failed to appear in Benton County Circuit Court and a bench warrant was issued for his arrest. *Plaintiff's Response* (hereinafter *Resp.*) at

---

[1] While at the BCDC, the plaintiff used the name Scott Fox on the grievances and medical requests he submitted. Plaintiff also submitted this lawsuit under the name Scott Fox. However, a name change (Scott Jefferson Fox Richey) was entered when mail was returned from the Arkansas Department of Correction, Grady Unit, because the "name and number did not match."

¶ 1.  On July 17, 2005, Richey was arrested by the Rogers Police Department for theft by receiving and fleeing.  *Id.* at ¶ 2.

On July 17, 2005, Richey was taken to the St. Mary's Hospital for treatment for injuries sustained when he ran from the police and was tackled.  *Resp.* at ¶ 3.  Richey had a laceration to his forehead and a wound on his shoulder but he refused sutures instead taking the option of a liquid bandage.  *Id.* at ¶ 4.  He also had bruising and swelling under his right eye, an abrasion on his right elbow, and an abrasion on his hand.  *Id.*

Richey was booked into the BCDC on July 17, 2005, on charges of fleeing, resisting arrest, and violation of the DWI act.  *Resp.* at ¶ 5.  He was incarcerated solely because of the pending criminal charges.  *Id.*

As part of Richey's intake, a medical questionnaire was completed.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 1, Vol. 1, at page 8.  The intake form indicated Richey was under the influence of alcohol and was positive for the Human Immunodeficiency Virus (HIV).  *Id.*  Richey did not sign the medical intake form.  *Id.*

Richey indicates the BCDC already knew his HIV-positive status from the hospital. *Resp.* at ¶ 7.  Richey indicates they also knew he had Hepatitis C and had received instructions from the hospital as well as follow-up sheets.  *Id.*

The BCDC has a policy of segregating inmates and detainees who suffer from communicable diseases.  *Defts' Ex.* 4.  According to Richey, he was placed in a holding cell in the booking area and remained there while at the BCDC until approximately September 10th. *Plaintiff's Exhibit* 1 at page 7.  Richey maintains there was a "time sheet" outside his holding cell

-2-

with "AIDS" printed on it.  *Id.*  Richey asserts anyone in the booking area could see the "time sheet."  *Id.*

Richey appeared in court on July 19, 2005, and bond was set at $23,500.  *Resp.* at ¶ 9. Richey was to appear in court again on August 29, 2005.  *Id.*

On July 19, 2005, Deputy Michael Houston of the Benton County Sheriff's Office submitted facts constituting probable cause for arrest regarding Richey smoking in the holding cell of the jail and hiding a lighter in his anus.  *Defts' Ex.* 1, Vol. 1 at pages 17 & 18.  Richey was charged with furnishing prohibited articles.  *Id.*

Richey maintains he was not smoking.  *Resp.* at ¶ 12.  He further states the BCDC dropped the charge.  *Id.*

On July 19, 2005, Richey was treated by Dr. Mullins.  *Defts' Ex.* 1, Vol. 1 at page 24. Dr. Mullins noted Richey had been in a car accident a couple of days ago and presented with a right black eye that was swollen shut.  *Id.*  According to Dr. Mullins' notes, Richey stated he had been drinking when he had the accident.  *Id.*  Richey's right hand was tender and mildly swollen. *Id.*  Dr. Mullins prescribed Keflex, Ibuprofen, Prednisone, and 1 cc IM Decadron and wanted to re-check Richey in seven or eight days.  *Id.*

Richey maintains he never told Dr. Mullins he was in a car accident.  *Resp.* at ¶ 14(A). Richey did receive the prescribed medications.  *Resp.* at ¶ 14(B).

On July 19, 2005, Richey requested an address for Judge "Stypes" in order to request a § 1983 form.  *Resp.* at ¶ 15.  On July 21, 2005, a court information sheet was completed indicating Richey was to appear in court on July 27, 2005.  *Id.* at ¶ 16.

AO72A
(Rev. 8/82)

On July 22, 2005, a pretrial release inquiry was signed by the judge. *Resp.* at ¶ 17. On July 22, 2005, a warrant was served upon Richey for robbery. *Id.* at ¶ 18.

On July 22, 2005, Richey received a letter from Judge Stanley Ludwig regarding fines owed in the amount of $1,883.94. *Resp.* at ¶ 19. On July 22, 2005, a court information sheet was completed indicating Richey was to appear in court on August 31, 2005, on a hot check charge. *Id.* at ¶ 20. While the warrant was served on him, Richey states he did not write the hot check. *Id.* at ¶ 20. He states he was incarcerated when the check was written. *Id.*

On July 22, 2005, Richey requested a copy of the paperwork associated with his bond hearings and the public defender's address. *Resp.* at ¶ 21. He was provided with the information. *Id.*

On July 25, 2005, Deputy Katharine Wiens reported that while moving inmate Lisa Brewer she found a note passed to Brewer by Richey. *Defs' Ex.* 1, Vol. 1 at page 33. Richey's cell was then searched and contraband found. *Id.* Wiens informed Richey that he was being locked down for correspondence and attempted correspondence without authorization and for concealing items from jail staff. *Id.*

Although Richey denied he passed the note, *resp.* at ¶ 22, he agrees that he was found guilty of a disciplinary violation on July 25, 2005, and received 10 days lock-down and loss of privileges for correspondence/attempted correspondence without authorization, *resp.* at ¶ 23 & ¶ 24. Richey was locked down until August 4th. *Id.*

On July 26, 2005, Richey submitted a grievance noting that his injuries were no longer bleeding and asking to go to general population. *Resp.* at ¶ 25(A); *Defs' Ex.* 1, Vol. 1 at page 37. Captain Petray responded that Richey would remain in his current housing. *Id.*

-4-

On July 26, 2005, Richey complained that he was not allowed to exercise and had not received clean underwear in over two days.  *Resp.* at ¶ 26; *Defts' Ex.* 1, Vol. 1 at page 38.  He stated his "TC count" was low and his "viral load" high which made his immune system weak.  *Id.*  He also requested a blanket.  *Id.*  He stated he was in the cold and a cold could kill him at this point.  Id.  Captain Petray responded that Richey would remain in his current housing.  *Id.*

Richey was diagnosed as HIV-positive in 1990.  *Resp.* at ¶ 27(A).  When his TC count is low, Richey indicates this means his immune system is low and cannot fight colds, diseases, etc.  *Id.* at ¶ 27(C).  He knew his TC count was low because he had been to his primary care physician, Dr. L. McGhee, and had blood work done.  *Id.* at ¶ 27(D).

Richey indicated the term "viral load is how much the HIV is in your blood."  *Resp.* at ¶ 27(E).  He knew his viral load was high because of his recent visit to Dr. McGhee.

Prior to his incarceration at the BCDC, Richey was being treated by Dr. Linda McGhee at the Washington County HIV Clinic.  *Resp.* at ¶ 27(G).  He was receiving the following medications:  Sustiva 600 mg., 1 at bed time; Zerit 40 mg., 1 twice a day; Epivir 150 mg., 1 twice a day; Sporanox 100 mg., 1 daily; Bactrim 800 mg daily; Klonopin 1 mg., 1 twice a day; Wellbutrin 150 mg., XL 1 daily; and Albuterol inhaler 2 puffs q6h.  *Id.*

On July 27, 2005, Nurse McDonald noted that Richey was in court.  *Resp.* at ¶ 28.  On July 27, 2005, a court information sheet was completed indicating Richey was to appear in Bentonville Municipal Court within 30 days of his release.  *Id.* at ¶ 31.  On July 27, 2005, a court information sheet was completed indicating Richey was to appear in Benton County District Court within 30 days of his release.  *Id.* at ¶ 32.

-5-

On July 27, 2005, Richey's case on the robbery charge was reset to August 1. *Defts' Ex.* 1, Vol. 1 at page 44; *Resp.* at ¶ 33. A note was made that Richey had Acquired Immune Deficiency Syndrome (AIDS) and caution should be used. *Id.*

On July 27, 2005, Richey sent in a request asking to know when his week began and ended for the purpose of sending out personal letters. *Resp.* at ¶ 30. Jail staff responded that the week started on Monday and ended on Sunday. *Id.* He had sent two letters that week. *Id.*

On July 28, 2005, Richey was seen by Dr. Mullins. *Resp.* at ¶ 34. He complained his right shoulder and right hand were bothering him a bit. *Id.* Dr. Mullins noted Richey's face looked very good and the swelling around his eye was completely gone. *Id.* Dr. Mullins noted Richey's hand looked good and had a full range of motion. *Id.* Dr. Mullins continued the Ibuprofen for three days. *Id.*

On July 28, 2005, Richey was moved by Officer Mike Bittle. *Resp.* at ¶ 35(A). Richey was taken to the Washington County Detention Center to go to court. *Id.* at ¶ 35(B).

On July 29, 2005, Dr. Linda McGhee of the Washington County HIV Clinic sent a letter to Nurse McDonald listing the medications Richey needed to take as: Sustiva, Zerit, Epivir, Sporanox, Klonopin, and Wellbutrin. *Defts' Ex.* 1, Vol. 1 at page 47. However, Dr. McGhee stated the "most important are the Sustiva, Zerit, and Epivir." *Id.*

There is a handwritten notation that states: "also, Needs Bactrim." *Id. See Resp.* at ¶ 36. There are no initials next to the handwritten notation. *Defts' Ex.* 1, Vol 1 at page 47. It is not clear if the notation was made by Dr. McGhee or someone else.

-6-

On July 31, 2005, Richey asked to speak to Lt. Hook.  *Defts' Ex.* 1, Vol. 1 at page 49.
On August 2nd Lt. Carter wrote in the response area of the form that Richey had been spoken
to that day.  *Id.*

On August 3, 2005, Richey requested a print out of letters he had sent and received.
*Resp.* at ¶ 38.  In response, he was given a handwritten list.  *Id.*

On August 3, 2005, Richey submitted a grievance complaining about being segregated
and discriminated against.  *Resp.* at ¶ 39.  He stated that on other occasions when he was in the
BCDC he was in general population despite his medical history.  *Id.*  He complained there were
inmates with the same medical condition that were not segregated.  *Id.*  Petray responded that he
had already answered this issue.  *Id.*

Richey states the only answer he had ever received was the statement that he would
remain on his current housing status.  *Resp.* at ¶ 39.  Richey states Petray did not offer any
additional information.  *Id.*

Richey was seen by Dr. Mullins on August 11, 2005.  *Resp.* at ¶ 40.  He was complaining
that his right shoulder and right hand had been messed up since July 17th.  *Id.*  He also indicated
he was HIV positive.  *Id.*  Dr. Mullins noted Richey had a full range of motion in his right wrist.
*Id.*  Dr. Mullins ordered an x-ray of Richey's right shoulder.  *Id.*  Dr. Mullins prescribed Sustiva,
Zerit, and Epivir.  *Id.*  He stated he was not going to give Richey the other medications, that were
for his behavior, instead observing his behavior and seeing how he did.  *Id.*

Richey notes that it had taken nearly a month for him to be prescribed his HIV
medications.  *Resp.* at ¶ 40.  Furthermore, Richey maintains he truly needed the other

AO72A
(Rev. 8/82)

medications. *Id.* Finally, Richey asks where the x-rays are that were ordered by Dr. Mullins. *Id.*

Prior to his incarceration at the BCDC, Richey states he was taking Sustiva, Zerit, and Epivir on a daily basis. *Resp.* at ¶ 41. He did not bring the medications with him to the jail because he was arrested away from his living quarters. *Id.* Richey indicates he did not have someone bring the medications to the jail because his family was out of town. *Id.*

On August 11, 2005, Richey submitted a grievance. *Resp.* at ¶ 42. He asked if he was going to get the other medications that Dr. McGhee had him on (Wellbutrin, Bactrim, Kolonapin, asthma spray, and rash cream). *Id.* He also asked when he was going to get something for the pain in his shoulder and when his labs would be done for his HIV+/AIDS. *Id.*

Petray responded that the grievance would be forwarded to medical. *Resp.* at ¶ 42. Richey agrees that Petray indicated he would forward the grievance to the medical staff. *Id.* However, Richey indicates he doesn't know if Petray did so. *Id.* Richey maintains he is still having pain in his shoulder. *Id.*

On August 12, 2005, Deputy Fernandez reported that she observed Richey writing on the wall in holding cell one. *Resp.* at ¶ 43. As a result, Richey received a disciplinary for defacing county property and received 30 days lockdown and loss of privileges. *Id.* at ¶ 45.

On August 15, 2005, Richey requested a time change for his medication. *Resp.* at ¶ 46. Officer Nance responded that the request would be forwarded to medical. *Id.* Richey states nothing was ever done about the request. *Id.*

On August 15, 2005, a medical release form was faxed to the Washington County HIV Clinic. *Resp.* at ¶ 47. On August 18, 2005, Richey submitted a grievance indicating he was

-8-

being denied medications prescribed by Dr. McGhee. *Id.* at ¶ 48. He stated the medications all dealt with being HIV-positive, having ADD (Attention Deficit Disorder), ADHD (Attention Deficit and Hyperactivity Disorder), depression, and bi-polar. *Id.* He stated he was told by Dr. Mullins that $1,000 a month was enough to spend on Richey's medications and he looked fine to him. *Id.* Richey complained because his evaluation didn't last more than five minutes. *Id.* He also stated he needed blood work. *Id.*

In response, Richey was told the grievance would be forwarded to the medical department and that the doctor makes all decisions regarding medical care in the jail. *Resp.* at ¶ 49. Richey was seen by Dr. Mullins on August 18th. *Id.* at ¶ 50. Richey complained of pain in his shoulder. *Id.* He also wanted more of the medication he had when he was on the street. *Id.*

Dr. Mullins noted the x-ray of Richey's right shoulder showed no acute osseous abnormality. *Defs' Ex.* 1, Vol. 2 at page 14. Dr. Mullins felt Richey might have a contusion there but was healing. *Id.* Dr. Mullins noted Richey had a good range of motion, could raise his hand above his head, and could abduct well. *Id.*

Richey asserts that he could not raise his arm above his head. *Resp.* at ¶ 51. Furthermore, Richey wants to know where the x-rays that were taken were. *Id.*

With respect to Richey's medication, Dr. Mullins told him that the medicine he was getting was over $1,000 a month. *Defs' Ex.* 1, Vol. 2 at page 1. Richey wanted to know what that had to do with Dr. Mullins' prescription. *Id.* According to Dr. Mullins notes, Dr. Mullins replied that Richey was getting plenty of medicine and he didn't see the need for other medication. *Id.* Dr. Mullins notes indicate Richey asked for his anti-depressant but Dr. Mullins

-9-

did not believe Richey was depressed.  *Id.*  Dr. Mullins noted Richey was belligerent, and argumentative and did not look anything like a depressed patient.  *Id.*

Richey asserts he needed the medications prescribed by his primary care physician, Dr. McGhee.  *Resp.* at ¶ 52.  Richey concedes he was short with Dr. Mullins.  *Id.*

Dr. Mullins prescribed Ibuprofen for the shoulder contusion for seven nights.  *Resp.* at ¶ 53(A).  Richey received the Ibuprofen.  *Id.* at ¶ 53(B).

On August 23, 2005, Richey requested information on his court dates and asked for a hair cut and shave.  *Resp.* at ¶ 54.  In response, he was told to ask the evening shift the day before his court appearance.  *Id.*  Richey states he had to go to court unshaven.  *Id.*

On August 25, 2005, Richey submitted a grievance stating that he had not received any of his grievances regarding medical care back.  *Resp.* at ¶ 55.  Petray responded that the doctor makes medical decisions at the jail.  *Id.*

On August 28th Richey appeared in court and his bond was reduced to $15,000.  *Resp.* at ¶ 56.  On August 29, 2005, a criminal information was filed charging Richey with theft by receiving, resisting arrest, driving while intoxicated (first offense), fleeing, reckless driving, failure to obey traffic control devices, and furnishing prohibited articles.  *Id.* at ¶ 57.  On August 31st, a pretrial hearing was set for November 2, 2005.  *Id.* at ¶ 59.

On September 3, 2005, Richey submitted a grievance complaining he had been denied a shave for court on August 29th and August 31st.  *Resp.* at ¶ 60.  He stated he did not look good for the judge.  *Id.*  He also stated he was being treated like an outcast and there was a label outside his cell that said AIDS.  *Id.*  He complained his confidentiality was being breached by

-10-

others being told that he had AIDS.  *Id.*  In response, Richey was told that Petray would see about

getting Richey a shave.  *Id.* at ¶ 61.

On September 3rd Richey submitted a grievance complaining that he was only getting

about 1/4th of his grievances answered.  *Resp.* at ¶ 62.  He asked if they got to choose which

ones they would answer.  *Id.*

On September 4th Richey requested reading glasses and a dictionary.  *Resp.* at ¶ 63.  He

stated he would like his family from out of state to ship him the items.  *Id.*  Petray responded that

the jail did not accept packages.  *Id.*

On September 4th Richey requested addresses for the parole office, ADC, ACLU, Judge

Clinger, and Judge Keith.  *Resp.* at ¶ 64.  He was provided with the addresses.  *Id.*

On September 6, 2005, Richey appeared in court and a bond reduction was denied.  *Resp.*

at ¶ 65.  On September 7th Richey was seen by Dr. Mullins.  *Resp.* at ¶ 66.  He was complaining

of right shoulder pain, a rash on his left shoulder, and a cold and sinus problems.  *Id.*

Dr. Mullins noted Richey had a slightly congested nose and a dry rash on his left shoulder

and a small rash on his forehead about the size of a dime.  *Defts' Ex.* 1, Vol. 2 at page 38.  With

respect to Richey's right shoulder, Dr. Mullins believed Richey had a good range of motion but

he noted Richey was not cooperating as far as raising his right arm above his head.  *Id.*  Dr.

Mullins noted Richey could abduct it well.  *Id.*

Richey states he could not abduct it well.  *Resp.* at ¶ 67.  With respect to his range of

motion, Richey indicates his right arm and shoulder are still in pain.  *Id.*

Dr. Mullins diagnosed Richey with mild tendinitis of the right shoulder and mild

sinusitis.  *Defts' Ex.* 1, Vol. 2 at page 38.  Dr. Mullins prescribed Triamcinolone ointment for

-11-

the rash, Ibuprofen, Erythromycin, and Deconamine. *Id.*  He was going to re-check Richey in ten days.  *Id.*  Richey states he cannot fully recall whether he received all the prescribed medication but the jail should have the daily medication logs he had to sign when medication was dispensed. *Resp.* at ¶ 68(A) & ¶ 68(B).

On September 11th Richey submitted a request.  *Resp.* at ¶ 69.  He stated no one had a problem with his illness and they would like to converse and play cards with one another.  *Id.* Lt. Carter responded that Richey would remain in his current housing status.  *Id.*

On September 12th, Richey submitted a grievance stating that they are forgetting him over there as far as medication, clothing, and Sunday supplies went. *Resp.* at ¶ 70.  In response, Petray stated he would get with the sergeant about the matter.  *Id.*  Richey states that Petray never did get back with him.  *Id.*

On September 14th, Richey submitted a grievance asking for use of one of the little gray trash cans.  *Resp.* at ¶ 71.  He stated he picked up a lot in the day room and in his cell and didn't want to clog the toilet with trash and dust bunnies.  *Id.*  In response, Petray stated he would check on it.  *Id.*  Richey states he never heard back from Petray and never got a trash can.  *Id.*

On September 17th Richey requested a letter from New York that he had been expecting. *Resp.* at ¶ 72.  He said he wanted to be sure it hadn't been sent back.  *Id.*  In response, he was told that at that time there was no letter from New York for him.  *Id.*

On September 18th Richey asked to speak with someone about a Bible.  *Resp.* at ¶ 73. In response, Richey was told that the Chaplin would be informed of his request and desire to speak with someone.  *Id.*  However, Richey states the Chaplin never visited him.  *Id.*

On September 19th Richey was picked up by Officer James Shipley and taken to the Washington County Detention Center. *Resp.* at ¶ 74. Richey returned to the BCDC on October 5th. *Id.* at ¶ 75.

On October 5th, Richey requested his mail that had been received since September 19th. *Resp.* at ¶ 76. The mail was given to him. *Id.* However, Richey states not all the mail was given to him. *Id.*

On October 7th Richey submitted a grievance complaining about a breach of confidentiality. *Plff's Ex.* 1 at page 66. Richey indicated he was in the detoxification cell when he overheard Deputy Echols stating that Richey could not be put in with another inmate because Richey had AIDS. *Id.* At the time, Richey indicated a family friend was present. *Id.*

In response, Petray indicated he had talked to Echols about this incident. *Plff's Ex.* 1 at page 66. Petray said Echols did not recall the incident. *Id.* Further, Petray stated his records did not show Richey being in the detox. cell. *Id.*

On October 8th Richey requested information about his property and the letters that had come in for him from September 19th to October 5th. *Resp.* at ¶ 77. He was told his property had been placed in his black bag and that he needed to ask the intake deputy when he was not busy to check Richey's bag for mail. *Id.*

On October 8th, Richey submitted a grievance stating he had been denied recreation and a shower that day. *Resp.* at ¶ 78. In response, Petray stated that his records showed Richey received recreation that day. *Id.*

On October 10th, Richey submitted a grievance complaining that his recreation and shower were being played with. *Resp.* at ¶ 79. He stated the HIV-positive people were told to

-13-

take recreation at 4:45 a.m. before the lights were even on in the rooms.  *Id.*  Petray responded

that Richey was receiving recreation and did not get to dictate what time it was taken.  *Id.*  Petray

also indicated Richey was getting to use the phone.  *Id.*

Richey objects to the recreation being at 4:45 a.m.  *Resp.* at ¶ 79.  He also states no one

would be up at home at that time if he called them and no one would be in their offices yet.  *Id.*

On October 11th Richey complained that he had just returned from WCSO and brought

two medications (Sporanox and Bactrim) but that Dr. Mullins was not giving Richey the

medications.  *Resp.* at ¶ 80.  Richey also stated that he had not received his lab work.  *Id.*  Petray

responded that Richey's grievance would be forwarded to medical.  *Id.*  Petray stated the doctor

made all medical decisions.  *Id.*

On October 11th Richey was seen by Dr. Mullins.  *Defts' Ex.* 1, Vol. 2 at page 53.

Richey voiced multiple complaints.  *Id.*  He wanted Sporanox for his fingernail.  *Id.*  Dr. Mullins

noted one tiny bit of fungus on one part of Richey's nail and didn't believe it justified a Sporanox

prescription.  *Id.*  Richey indicated he had been taking it for years because of thrush in the mouth.

*Id.*  However, examination of his mouth revealed no thrush.  *Id.*

According to Richey, he told Dr. Mullins that Dr. McGhee had prescribed the Sporanox

for thrush in the mouth, finger, and a rash on his chest.  *Resp.* at ¶ 81.  Richey states he later

developed thrush because the medication was not prescribed.  *Id.*

Dr. Mullins noted a little dry area on Richey's anterior chest and small areas on his back

that might be fungal related.  *Defts' Ex.* 1, Vol. 2 at page 53; *Resp.* at ¶ 82(A).  Dr. Mullins noted

he had ordered Cleocin lotion for this but then Richey was transferred to another jail for court

-14-

and did not take it.  *Id.*  Dr. Mullins gave Richey the Cleocin lotion for ten days.  *Id.*  Richey received the lotion but states it didn't work.  *Resp.* at ¶ 82(A) & ¶ 82(B).

Richey went out cussing and swearing at Dr. Mullins.  *Defts' Ex.* 1, Vol. 2 at page 53. Dr. Mullins indicated he would not see Richey back until he could "talk straight."  *Id.*

Richey indicates Dr. Mullins didn't personally tell him this.  *Resp.* at ¶ 83.  Richey asks why it is hard to understand that he needed his regular prescription medication that he had been taking for years.  *Id.*

On October 11, 2005, Richey requested information on his bond.  *Resp.* at ¶ 84.  Deputy Flowers responded back that Richey's bond was $24,000 total.  *Id.*

On October 12, 2005, Richey submitted a grievance regarding the food he was served. *Resp.* at ¶ 85.  Richey indicated he was served smaller portions than inmates in the general population, got different items than inmates in general population, and a lot of the times items were missing.  *Id.*  Richey indicates he also objected to his food being served on Styrofoam trays because he believed this served to label him.  *Id.*

In response, Richey was told that he was served the same amount of food as all other inmates.  *Defts' Ex.* 1, Vol. 2 at page 55.  He was told all the food was measured in the same way.  *Id.*  Richey, however, disagrees that he received the same amount of food and believes this can be verified by Deputy Blackmon.  *Resp.* at ¶ 86.

On October 16th Richey wrote requesting information on jail standards.  *Resp.* at ¶ 87. On October 16th Richey asked for a shave and if possible a hair cut because he had court the next day.  *Id.*  Richey was allowed to shave.  *Id.*  However, he asserts he was denied a hair cut

-15-

due to illness.  *Id.*  On October 17th Richey appeared in court on the reckless driving, fleeing and resisting arrest charges.  *Resp.* at ¶ 89.

On October 19th Richey complained that his rashes were getting worse.  *Resp.* at ¶ 90. He stated Dr. Mullins had given him two types of medication that did not work.  *Id.*  Richey indicated he needed the medication that Dr. McGhee prescribed for the rashes and stated it helped.  *Id.*

Petray responded that Richey's request would be forwarded to medical.  *Resp.* at ¶ 91. He also said the doctor made all medical decisions in the jail.  *Id.*

On October 19, 2005, Richey submitted a grievance asking why he had not been transported back to the Arkansas Department of Correction (ADC).  *Resp.* at ¶ 92.  He indicated it had been going on sixteen weeks.  *Id.*  He stated other inmates were transported to the BCDC for court and then sent back to the ADC.  *Id.*  Petray responded that Richey was at the BCDC on charges with bonds and would remain there until those charges had been disposed of.  *Id.* at ¶ 93.

Richey was asked when he was convicted and sentenced to a term of imprisonment at the ADC.  *Resp.* at ¶ 94.  He responded:  October 4, 2005, in Washington County Court to a term of six years imprisonment with four years suspended.  *Id.*

On October 19th Richey submitted a grievance.  *Resp.* at ¶ 95.  He asked how he could fill out a § 1983 form completely if his grievances were not all returned to him.  *Id.*  He also stated the ones forwarded to medical were never answered.  *Id.*  Captain Petray responded that he answered all grievances that came to him and that the medical grievances were forwarded to medical because the doctor makes all medical decisions in the jail.  *Id.* at ¶ 96.

-16-

Richey was seen by Dr. Mullins on October 20th. *Resp.* at ¶ 97. Dr. Mullins noted that Richey had a small rash on his left shoulder and a small area on his forehead that was raised slightly. *Id.* Dr. Mullins diagnosed Richey with chronic dermatitis, etiology unknown. *Id.* Dr. Mullins stated he would attempt to find a dermatologist to see Richey. *Id.*

On October 20th, Richey submitted a written request asking to get the medication list sent by Dr. McGhee. *Resp.* at ¶ 98. Richey indicated Dr. Mullins told Richey to go through the channels to get it and ask Captain Petray for the list. *Id.* In response, Petray stated the doctor made all medical decisions. *Id.* at ¶ 99.

On October 21st, Richey complained about the food and said he was not getting the same food portions, was getting different items, and items were missing. *Resp.* at ¶ 100. He also stated that Dr. Mullins was not treating his shoulder. *Id.* Richey indicated his shoulder was still causing him pain but Dr. Mullins would not treat it. *Id.*

In response, Petray said Dr. Mullins made all medical problems in the jail. *Defts' Ex.* 1, Vol. 2 at page 68. Petray also said that he had answered the "food issue." *Id.* Richey maintains Petray never fully addressed the food issue. *Resp.* at ¶ 101.

On October 24th Richey asked for and received information on his bonds and court dates. *Resp.* at ¶ 102. On October 25th Richey asked that the phone be reset so he could record his name. *Id.* at ¶ 103. It was done. *Id.*

On October 26th, Richey asked if he was sentenced in Washington County when he would go to the ADC. *Resp.* at ¶ 104. He also asked why his parole had not been revoked. *Id.* Richey asked if he could bond out. *Id.*

-17-

Richey was told that he would be on the list for ADC in the county where he was sentenced. *Resp.* at ¶ 105. He was told there was no parole hold on him. *Id.* He was told if he bonded out, he would be sent to the county that sentenced him until he went to prison. *Id.* Finally, he was told that he would not go to prison until the ADC called for him. *Id.*

On October 25th an appointment was made for Richey to see Dr. Clifton on December 8th. *Resp.* at ¶ 106. On October 27th Richey complained that the screws in his reading glasses were falling out. *Id.* at ¶ 107. Officer Clifford responded that they were trying to find the eyeglass repair kit. *Id.*

On October 27th Richey submitted a grievance regarding his rashes. *Resp.* at ¶ 108. He stated Dr. Mullins had told him the week before that he was making an appointment for Richey with a skin doctor. *Id.* Richey indicated that Dr. McGhee said he needed to get back on Alcortin. *Id.* In response, Richey was told his grievances would be forwarded to medical. *Id.*

On October 27th Richey said he was being discriminated against because food items were still missing from his Styrofoam trays. *Resp.* at ¶ 109(A). In response, Richey was told that he got everything that any other inmates got. *Id.* He was told he was not being shorted and that everything is measured the same. *Id.* Richey, however, believes he was being shorted and asserts that several officers witnessed the shortage of food and the missing items. *Id.*

Richey was asked to explain in detail how he was being shorted food. *Resp.* at ¶ 109(B). He was also asked to state who he believed was responsible. *Id.* Richey responded that he received smaller portions, that sometimes his dessert or bread was missing, or there would be less meat. *Id.* Richey believed the kitchen was responsible for the incorrect trays being sent to him. *Id.*

-18-

On October 31st Richey asked for, and received, information on his court dates.  *Resp.* at ¶ 110.  He was also told there was a hold on him as a result of his being sentenced to the ADC in Washington County.  *Id.*

On November 1, 2005, Richey did not receive mustard or mayo with his turkey sandwich.  *Resp.* at ¶ 111(A).  He asked if he was getting treated differently because he had AIDS.  *Id.* Petray responded that Richey was getting the same food as everyone else.  *Id.*

Richey believes his not receiving mustard or mayo was a result of his being HIV-positive because he had been submitted grievances about being shorted on food for way too long for it to be a simple mistake or two.  *Resp.* at ¶ 111(B).  Richey states he was "shunned upon in all respects" of his detention at the BCDC.  *Id.*

On November 2nd Richey asked when he had court with Judge Skaggs.  *Resp.* at ¶ 112. In response, he was given his court date.  *Id.*

On November 3rd Richey requested a shave/haircut for Judge Skaggs' court.  *Resp.* at ¶ 113.  In response, Richey was told he did not have court.  *Id.*

On November 3rd Richey submitted a grievance regarding phone privileges.  *Resp.* at ¶ 114.  He stated he had been told he could use the phone but was not let out.  *Id.*  Richey indicated he pushed the emergency button and was asked what his emergency was.  *Id.*  Richey asked to use the phone.  *Id.*  Richey was then told by Corporal Lisenbee that if he continued to push the button he would be locked down.  *Id.*

Petray responded to the grievance on November 10th.  *Defts' Ex.* 1, Vol. 3 at page 5. Petray told Richey the emergency button was for emergencies.  *Id.*  He stated Richey was allowed to use the phone.  *Id.*

AO72A
(Rev. 8/82)

On November 3rd Richey complained that he was waiting for two grievances to be answered. *Resp.* at ¶ 115. The first grievance about the food service and the other about recreation time and what it consisted of and the time limit. *Id.* In response, Petray stated he had answered Richey's grievances on food service numerous times. *Id.* Petray stated Richey was getting the same amount as everyone else. *Id.* As for recreation, Petray stated it consisted of Richey's one hour outside his cell. *Id.*

On November 4th Richey complained of pain in his right side under his rib cage. *Resp.* at ¶ 116. In response, Richey was told he would see the doctor. *Id.*

On November 6th Richey asked for information about his court before Judge Skaggs. *Resp.* at ¶ 117. Officer Dragovich responded that the computer indicated Richey had no further hold and would need to report to court within 30 days of his release from prison. *Id.*

On November 7th Richey was seen by Dr. Mullins. *Resp.* at ¶ 118. Richey indicated his liver was hurting him. *Id.* Dr. Mullins examined Richey and noted his liver was not enlarged. *Id.* He had normal bowel sounds. *Id.* Dr. Mullins also noted that the rash on Richey's shoulder looked better but he was already scheduled to see a dermatologist. *Id.* Dr. Mullins concluded no treatment was needed for Richey's liver. *Id.*

Richey agrees this was Dr. Mullins' conclusion. *Resp.* at ¶ 118. However, Richey states he was still in pain. *Id.* He indicates he now knows his liver was acting up due to Hepatitis B and Hepatitis C. *Id.* Richey maintains lab work or a liver biopsy should have been done at the time. *Id.*

-20-

On November 8th Richey complained that he had been waiting to see the dermatologist since the 3rd week in October. *Resp.* at ¶ 119(A). He stated that he believed he was being "slow walked and sidestepped" at the expense of his health. *Id.*

On November 9th, Petray responded that he would forward the grievance to medical. *Defts' Ex.* 1, Vol. 3 at page 11 At some point, the nurse noted that Richey's appointment had been scheduled but that Richey was very impatient. *Id.*, at page 14. Richey indicates he never saw the nurse's response to his grievance. *Resp.* at ¶ 119(B).

Richey also submitted a medical request on November 8th. *Resp.* at ¶ 120(A). He noted that he had sores on his lip and in his mouth. *Id.* He stated he believed he had thrush in the mouth because he was not receiving Sporanox. *Id.* In response, Richey was told he would see the nurse on Friday. *Id.*

Richey was seen by Nurse McDonald on November 11th. *Defts' Ex.* 1, Vol. 3 at page 34. She noted Richey had refused his medication at 8:30. *Id.* She applied silver nitrate to the chancre sore. *Id.*

Richey first denies that he refused his medication. *Resp.* at ¶ 120(B). He then indicates silver nitrate was not the correct medication to be utilized on him in view of his AIDS. *Id.*

On November 11th Richey asked who had his medication, Sporanox and Bactrim, that he had brought back from Washington County on October 5th. *Resp.* at ¶ 121. In response, he was told those drugs had not been prescribed by Dr. Mullins so he would not get them. *Id.*

On November 11th Richey asked for clarification as to what recreation time was considered. *Resp.* at ¶ 122. He stated he understood it was to include a shower, phone calls, reading the paper, cleaning his cell, exercising, getting requests, and sharpening pencils. *Id.* He

-21-

stated not enough time was allowed.  *Id.*  In response, he was told that recreation is one hour in duration.  *Id.*  He was told he would be allowed the other things he spoke of in a timely fashion in addition to one hour of recreation.   *Id.* While he was told this, Richey states he was never given the time to do the other things other than during the one hour of recreation.  *Id.*

Finally, on November 11th Richey submitted a request about food service.  *Plff's Ex.* 1 at page 29.  He asked if a person who had gone from being HIV-positive  to having full blown AIDS should receive a high calorie diet, one containing more proteins and nutrients such as fruits and vegetables to keep the immune systems up or maybe a multi-vitamin with iron.  *Id.*  He asked if the same person could get an extra blanket because of the controlled climate in which the person was cold all the time.  *Id.*  In response, Lt. Carter indicated he would forward the request to the medical staff.  *Id.*

On November 12th Richey asked someone to check his jacket for a warrant for a hot check.  *Resp.* at ¶ 123.  He was provided a copy.  *Id.*

On November 12th Richey complained that James Churchill was allowed to see the AIDS doctor, Dr. McGhee, but Richey was not allowed to.  *Resp.* at ¶ 124.  Richey also complained his rashes were getting worse.  *Id.*  In response, Richey was told Churchill had not seen Dr. McGhee while he was incarcerated at the BCDC.  *Id.*

On November 17th Deputy Sharp conducted a cell inspection and found an extra mattress, socks, and a cup in Richey's cell.  *Defts' Ex.* 1, Vol. 3 at page 21.  Richey was given a disciplinary and found guilty of concealing items from jail staff.  *Resp.* at ¶ 126.  He was given ten days lockdown and loss of privileges.  *Id.*

-22-

On November 18th Richey submitted a medical request. *Resp.* at ¶ 127(A).  He stated

he was catching a cold.  *Id.*  In response, he was told he would be seen by the nurse.  *Id.*  Richey

states he was in a very cold cell with no mat and no blanket.  *Id.*  Because he had AIDS, he

maintains this was the equivalent of playing Russian roulette with his life.  *Id.*

Nurse McDonald noted Richey refused a blood sugar test on November 18th.  *Resp.* at

¶ 127(B).  Richey states he did not believe the blood sugar test applied to him and this must have

been for another inmate.  *Id.* at ¶ 127(B), (C), & (D).

Richey was seen by Nurse McDonald for a stuffy nose on November 22nd.  *Resp.* at ¶

127(E).  She noted Richey had no temperature and his lungs were clear.  *Id.*  She prescribed

Benadryl for three nights.  *Id.*

On November 18th Richey complained that his legal mail was opened when he received

it.  *Resp.* at ¶ 128.  He asked why it was opened.  *Id.*  Petray responded that he had no idea but

he could assure Richey that no one was trying to read his legal mail.  *Id.*

On November 19th Richey submitted a grievance asking if he was to understand that he

was housed in a cell 23/7 and fed on Styrofoam trays because he had a communicable disease.

*Defts' Ex.* 1, Vol. 3 at page 25; *Resp.* at ¶ 129.  In response, Richey was told he would remain

on his current housing status.  *Id.*  He was also told his grievances about the food had been given

to the nurse.  *Id.*

On November 22nd Richey asked to be able to keep his Styrofoam cup.  *Resp.* at ¶ 130.

Lt. Carter said he would speak to the sergeants.  *Id.*  Richey notes that they had finally stopped

feeding him on Styrofoam trays.  *Id.*  However, he indicates the fountain in the sink did not work

AO72A
(Rev. 8/82)

properly so he asked for the Styrofoam cup to drink out of. *Id.* He states he used the cup to catch water drizzling out of the fountain. *Id.*

On November 23rd Richey submitted a medical request about a growth on the left side of his neck. *Resp.* at ¶ 131. He stated that Dr. Mullins had seen it two months ago and it was getting bigger. *Id.* He asked if he could be examined again. *Id.*

On November 23rd Richey submitted a grievance stating that he felt being housed 23/7 resulted in discrimination because his hour out must be used for a number of things including getting cleaning supplies, reading the newspaper, etc. *Resp.* at ¶ 132. In response, he was told it was not discrimination but that Lt. Carter would speak to the sergeants. *Id.* Richey indicates the problem was never solved. *Id.*

On November 29th Richey submitted a request regarding food service. *Plff's Ex.* 1 at page 31. After having received his food on Styrofoam trays for over 100 days, Richey asked why it had suddenly changed and he was now being given a regular tray like the inmates in general population. *Id.* In response, Lt. Carter stated Richey would be served meals out of regular trays. *Id.*

On December 1st and December 2nd Richey requested copies of the disciplinary violations he had been charged with, the results of the hearings, and his appeals. *Plff's Ex.* 1 at pages 32 & 33. In response he was told copies of these documents were not made for inmates. *Id.*

On December 2nd Richey submitted a grievance because a mat he received had dried blood on it and he had to request cleaning fluid. *Plff's Ex.* 1 at page 34. Richey stated the mats

AO72A
(Rev. 8/82)

needed to be sterilized properly. *Id.* In response, Richey was told the mats were being disinfected. *Id.*

On December 2nd Richey asked for his dictionary back. *Plff's Ex.* 1 at page 35. In response, he was told personal items were not allowed in the cells. *Id.*

Richey was seen by Dr. Missy Clifton, a dermatologist, on December 8th. *Resp.* at ¶ 135. She diagnosed Richey with superficial bcc (basal cell carcinomas) on the chest and back and prescribed Efudex for six weeks. *Id.* He was also prescribed Bactrim for two weeks for an early SCC (squamous cell carcinoma) v. carbuncle. *Id.* Richey received the medication prescribed by Dr. Clifton. *Resp.* at ¶ 136.

On December 9th Richey submitted another grievance about his dictionary. *Plff's Ex.* 1 at page 40. He indicated it had been taken and not returned. *Id.* He also complained about the unsanitized mat. *Id.* In response he was told the mats had been sanitized. *Id.* With respect to the dictionary, he was told all books were property of Benton County. *Id.*

On December 9, 2005, Richey submitted a request asking for a hair cut and shave before his trial. *Plff's Ex.* 1 at page 41. He was told he would receive a shave the day before court and he should ask the deputies in booking. *Id.*

On December 11th Richey submitted a grievance asking that the heat be turned up. *Plff's Ex.* 1 at page 42. He said the inmates in B intake 179 were cold. *Id.* Richey said he was especially susceptible to colds/flus. *Id.* In response, Richey was told the heat was working. *Id.*

On December 12th Richey submitted a request asking if they could find out if he was on Washington County's list to go to the ADC. *Plff's Ex.* 1 at page 43. He said he had full blown

AIDS and needed better treatment.  *Id.*  In response, Richey was told he was on Washington County's list and would go when the ADC called for hm.  *Id.*

On December 13th Richey submitted a grievance stating that he was finished at the BCDC and had been told by Judge Keith that he could go back to Washington County where he was first sentenced to the ADC.  *Plff's Ex.* 1 at page 44.  In response, Richey was told he had been sentenced in Benton County and would be transported to the ADC when they called for him.  *Id.*

On December 14th Richey submitted a medical request stating that his lips were dry and cracking causing them to bleed.  *Plff's Ex.* 1 at page 46.  In response, a notation was made that he would be seen by the nurse.  *Id.*

On December 16th Richey submitted a medical request asking that the doctor check his rashes out.  *Plff's Ex.* 1 at page 47.  Richey noted the medicine prescribed by Dr. Clifton was pretty harsh on the rashes and made them burn.  *Id.*  He stated he just wanted to make sure he was doing the right thing.  *Id.*  He indicated he might need to see Dr. Clifton again.  *Id.*  In response, a note was made that an appointment was "pending" with Dr. Clifton.  *Id.*

On December 18th Richey submitted another medical request stating he thought his rashes were getting worse.  *Plff's Ex.* 1 at page 48.  He asked that it be checked out and stated he might need to go back to the dermatologist.  *Id.*  In response, he was told to keep using the medicine and that he had another appointment with the dermatologist.  *Id.*

On December 19th Richey submitted a grievance stating he was concerned the medicine Dr. Clifton prescribed might be making the medicine worse.  *Plff's Ex.* 1 at page 49.  He stated he knew he had an appointment with Dr. Clifton in six weeks but needed someone to see what

-26-

was going on because the reaction didn't look good. *Id.* In response, Petray said he would forward the grievance to the medical staff. *Id.*

On December 24th Richey submitted a medical request stating that his medication prescribed by Dr. Clifton for skin lesions had run out and that he was supposed to use it for six weeks. *Plff's Ex.* 1 at page 50. He asked why they continued to deny him medications prescribed by outside doctors. *Id.* A notation is made on the bottom of the request that he would see the doctor on December 27th. *Id.*

Richey submitted a grievance on the same subject that day. *Plff's Ex.* 1 at page 52. Petray responded that he would forward the grievance to medical. *Id.*

On January 5, 2006, Richey submitted a medical request stating that the swelling with a cystic opening under his skin was not improving. *Plff's Ex.* 1 at page 54. He stated he needed more oral antibiotic and a biopsy done. *Id.* He also stated the fungus under his nails could not be treated unless he was tested for liver functions. *Id.* A notation is made on the bottom of the form that he would see the doctor on Monday, January 9th. *Id.*

Richey contends Dr. Mullins was deliberately indifferent to his serious medical needs. *Resp.* at ¶ 139. Richey contends his serious medical needs were: his shoulder/arm; HIV-positive/full blown AIDS; rashes; mental health issues; asthma; Hepatitis C; and thrush. *Id.* Richey maintains that Dr. Mullins either delayed Richey's treatment, denied him treatment, or failed to treat him for the conditions listed above and intentionally interfered with treatment prescribed by Dr. McGhee at the AIDS Clinic. *Id.*

With respect to Sheriff Ferguson, Richey contends Ferguson personally made decisions regarding Richey's medical care. Richey maintains Sheriff Ferguson adopted a policy of making

-27-

inmates pay the cost of their own medical care for pre-existing conditions.  In support, Richey attaches newspaper articles.  The articles indicate Ferguson had directed local hospitals to bill inmates personally for medical treatment in situations where the medical treatment was for a condition that existed prior to the individual being arrested and brought into the jail (pre-existing conditions).  However, the articles indicates the jail will still provide medication.

Richey only told the doctor and nurse at the BCDC that he was HIV-positive.  *Resp.* at ¶ 142.  According to Richey, the booking officer at the BCDC was told Richey was HIV-positive by a Rogers police officer.  *Id.*

Richey informed other inmates at the BCDC that he was HIV-positive.  *Resp.* at ¶ 141.  However, he maintains he did not do so until after his confidentiality had been broken.  *Id.*  He then tried to explain to other inmates that they could not catch AIDS from contact with him such as standing near him.  *Id.*  Richey also indicates Lisa Brewer asked him about it after a BCDC officer told her of Richey's status.  *Id.*

Richey states it was improper for his HIV-positive status to be posted on his cell in booking.  *Resp.* at ¶ 143.  Because of this, Richey states he feared abuse from inmates and also had to explain himself to others.  *Id.*

Defendants have submitted medication logs that indicated Richey was given Zerit, Epivir, and Sustiva from November 18th to November 29th.  *Resp.* at ¶ 133.  These logs also indicate Richey received Benadryl at bedtime on November 22nd, 23rd, and 24th.  *Id.* at ¶ 134.  The medication logs for the remainder of Richey's incarceration at the BCDC have not been submitted to the court.

-28-

Along with his response, Richey a various documents including a number of handwritten pages in which he discusses his treatment, copies of requests and/or grievances, and statements written by fellow inmates, Danny T. McCarthy, Michael David White, Gary Thompson, James Churchill, Luis Hernandez, and Lisa Brewer.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the

United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he or she violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).  Mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Defendants have moved for summary judgment on all of plaintiff's claims.  We will address each claim separately.

### *Denial of Adequate Medical Care*

From July of 2005 until October of 2005,  Richey was a pretrial detainee. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle  v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1)

-30-

that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting  Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).  *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992).  "A medical need is serious if it is obvious to the layperson or supported by medical evidence."  *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).   In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to

medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Richey alleges the defendants were aware of the fact that he was HIV-positive when he was booked into the jail on July 17, 2005, and despite this did nothing to get his prescribed medications for nearly a month. Even after he began receiving medications, Richey alleges the Dr. Mullins, at least in part for monetary reasons, authorized only certain of the medications Richey had been prescribed by the doctor at the HIV clinic. Richey maintains Dr. Mullins also failed to properly monitor Richey's HIV by the use of blood tests. When Richey continued to have a variety of problems, such as rashes, etc., which he asserts were related to his HIV-positive status, he contends Dr. Mullins denied him adequate medical treatment.

Although it has been held that the occasional missed dose of medicine, without more, does not violate the Eighth Amendment, *see e.g., Zentmeyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000); *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987)(inmate with heart condition missed a morning dose of medication; no showing that this was an instance of callous disregard in the face of a pressing medical emergency); *Herndon v. Whitworth*, 924 F. Supp. 1171 (N.D. Ga. 1995)(occasional missed doses of medication do not implicate the Constitution), in this case Richey was incarcerated at the BCDC from July 17, 2005, until August 11, 2005,[2] during this

---

[2] It appears Richey was at the Washington County Detention Center for some unspecified period of time beginning on July 28, 2005. *Resp.* at ¶ 35. It is not clear how long Richey was there. However, at least by July 31, 2005, Richey was back at the BCDC. *Defts' Ex.* 1, Vol. 1 page 49.

time he did not receive a single dose of his prescribed HIV medications.  Defendants have offered no explanation for this delay in obtaining Richey's prescription medications.  *See e.g., Munn v. Toney*, 433 F.3d 1087 (8th Cir. 2006)(missed-medication and missed-monitoring claims).  Richey was taking these medications on a daily basis prior to his incarceration.  If there had only been a few days or even a week delay in Richey seeing the doctor and obtaining the necessary prescription medication, there would not be a genuine issue of material fact.  However, in this case, it appears a month elapsed between Richey's incarceration and when he began receiving the medication.

Similarly, while a mere disagreement over which medications should be prescribed does not generally give rise to an Eighth Amendment claim, *see e.g., Lair v. Oglesby*, 859 F.2d 605, 606 (8th Cir. 1988), we believe there are genuine issues of fact as to whether the refusal to provide Richey with the other medications prescribed by Dr. McGhee was based on medical judgment or motivated by an effort to reduce the cost of the medication to the BCDC.  *See e.g., Chance v. Armstrong*, 143 F.3d 698, 703-04 (2d Cir. 1998)(action improperly dismissed for failure to state a claim where inmate alleged treatment recommendations were based on monetary incentives and not medical views).  Richey also alleges his condition was not properly monitored by means of blood work.  While we are not saying that cost may never be considered as a factor in selecting between two alternative treatments or available prescriptions, here Richey maintains Dr. Mullins chose to forego a number of prescriptions solely because of the cost to the facility.  Dr. Mullins' notes bear out, at least in part, Richey's claim.  On the record before us, we believe

-33-

there is a genuine issue of fact as to whether Dr. Mullins recommendation was based on the cost of the prescriptions to the facility and not medical judgment.

We additionally believe there are genuine issues of fact as to whether Dr. Mullins exhibited deliberate indifference in failing to monitor Richey's HIV status by means of blood work or other diagnostic tests. With respect to Sheriff Ferguson, we believe there are genuine issues of fact as to whether he established a policy that resulted in Richey's being denied adequate medical care.

### *Right to Privacy with respect to HIV Status*

Richey contends the defendants disclosed his HIV-positive status to other inmates and detention center personnel. He indicates this was done in a number of ways: he was placed in segregated housing; a "time sheet" was posted outside his cell for a period of time with the word AIDS written on it; he received smaller portions of food, food items were missing from his trays, and his meals on Styrofoam trays; he was denied haircuts and shave; he was only allowed to take recreation in the very early morning; and a deputy was overheard telling an inmate, in the presence of a family friend, that Richey had AIDS.

Defendants contend the disclosure of Richey's medical status was made by the plaintiff himself. Even if they did disclose Richey's status as an HIV patient, defendants maintain they are entitled, in their individual capacities, to qualified immunity on this issue. They contend their actions did not violate any clearly established constitutional rights of the plaintiff. Finally, defendants contend there is no basis on which the defendants in their official capacities can be held liable.

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The defense applies to individual capacity claims only. *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006).

"The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001). First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, the court must determine if the right was clearly established. *Washington*, 272 F.3d at 256.

In *Whalen v. Roe*, 429 U.S. 589, 599, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977), the Court discussed a constitutionally protected "zone of privacy" involving two different kinds of interests. *Id.*, 429 U.S. at 598-599. The first "is the individual interest in avoiding disclosure

-35-

AO72A
(Rev. 8/82)

of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* at 599.

Following *Whalen*, the courts have recognized a constitutionally protected right of individuals to avoid disclosure of personal matters including medical information. This right has been variously characterized as the right to confidentiality or the right to privacy. *See e.g., Cooksey v. Boyer*, 289 F.3d 513, 515-516 (8th Cir. 2002). However, as pointed out by the Eighth Circuit in *Cooksey* "[n]ot every disclosure of personal information will implicate the constitutional right to privacy." *Id.*, 289 F.3d at 516. It noted it had "consistently held that to violate the constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation . . . to further some specific state interest, or a flagrant bre[a]ch of a pledge of confidentiality which was instrumental in obtaining the personal information." *Id.* (citations and internal quotation marks omitted). This right extends to medical test results, medical records, and medical communications. *See Ferguson v. City of Charleston*, 532 U.S. 67, 78, 121 S. Ct. 1281, 149 L. Ed. 2d 205 (2001)(individuals have a reasonable expectation of privacy in medical test results and that those results will not be shared with nonmedical personnel without the patient's consent).[3]

With respect to those who are detained, it has been held that although "prisoners do not shed all constitutional rights at the prison gate, . . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293,

---

[3]For a general discussion of the right to privacy of medical records *see* Joel Glover and Erin Toll, *The Right to Privacy of Medical Records*, 79 Denv. U. L. Rev. 540, 541 (2002)("Over the last thirty years, the federal courts have uniformly accepted the principle that medical records are private and entitled to protection."). In the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936 (1996) Congress sought to ensure the privacy of medical records.

AO72A
(Rev. 8/82)

2301, 132 L. Ed. 2d 418 (1995).   A number of cases have addressed the issue of the right to privacy of medical information in the prison context.   In *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001), the Third Circuit held that "the Fourteenth Amendment protected an inmate's right to medical privacy, subject to legitimate penological interests." *Id.*, 257 F.3d at 311.

The Third Circuit stated:

> It is beyond question that information about one's HIV-positive status is information of the most personal kind and that an individual has an interest in protecting against the dissemination of such information. Moreover, a prisoner's right to privacy in this medical information is not fundamentally inconsistent with incarceration. Therefore, we join the Second Circuit in recognizing that the constitutional right to privacy in one's medical information exists in prison.

> We acknowledge, however, that a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen. We do not suggest that Doe has a right to conceal this diagnosed medical condition from everyone in the corrections system. Doe's constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security.

*Doe*, 257 F.3d at 317.  The court then held the law was not clearly established in 1995.  *See also Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999)(inmates have a right to privacy in their HIV and transsexualism status but such a right was not clearly established in 1991 at the time of the disclosure).

The Court of Appeals for the Eighth Circuit in *Tokar v. Armontrout*, 97 F.3d 1078 (8th Cir. 1996), addressed Tokar's argument that his constitutional right to privacy had been violated by his segregation.   Tokar argued the segregation disclosed his HIV-positive status to other inmates and officers.  *Id.*, 97 F.3d at 1084.  The court noted the Seventh Circuit in *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995) had held that "'[n]either in 1992 nor today was (is) the law

-37-

clearly established that a prison cannot without violating the constitutional rights of its HIV-positive inmates reveal their condition to other inmates and to guards in order to enable those inmates and guards to protect themselves from infection.'" *Tokar*, 97 F.3d at 1084 (*quoting Anderson*, 72 F.3d at 521). It noted that the Seventh Circuit court could find no Supreme Court or appellate court holding that prisoners had a "constitutional right to confidentiality of their medical records." *Tokar*, 97 F.3d at 1084 (*quoting Anderson*, 72 F.3d at 523). *See also Beers v. Stockton*, 2000 W.L. 1839535, *1 (8th Cir. 2000)(Medical information released to nurse at another jail where Beers had been transferred after he made representations regarding what medications he was taking. Jury could not conclude that "the release was made in bad faith or for reasons unrelated to the continuity of Beer's medical care and to prison security. Likewise, Stockton's release of medical information to [facility] nonmedical personnel was related to penological concerns.").

In *Doe v. Wigginton*, 21 F.3d 733 (6th Cir. 1994), the plaintiff argued that his "constitutional right to privacy" was violated by the disclosure of his HIV infection by a sergeant. *Id.* at 738. The court relying on prior circuit precedent concluded "the Constitution does not encompass a general right to nondisclosure of private information." *Id.* (citation and internal quotation marks omitted).

More recently in *Leher v. Bailey*, No. 4:03CV00953, 2006 WL 1307658 (E.D. Ark. May 10, 2006), the court addressed a claim by a prisoner that an officer and jail nurse had released information to other inmates informing them the plaintiff was HIV positive. *Id.*, slip op. at 2. The court noted the split in the Circuit courts on whether there was a right to confidentiality of medical information in the prison context. *Id.* The court stated:

-38-

The undersigned has been unable to find any Eighth Circuit or United States Supreme Court precedent that establishes that the right to confidentiality in HIV status in the prison context. Thus, it is with confidence that the undersigned reaches the conclusion that there was no clearly established right in 2003 under the Fourteenth Amendment for an inmate not to have medical information, such as HIV status, disclosed by government actors regardless of whether or not the actors made the disclosure on the basis of a legitimate penological reason.

*Id.* at 5.

We believe the defendants are entitled to summary judgment on this claim. First, we do not believe taken in the light most favorable the plaintiff the facts alleged show the defendants' conduct violated a constitutional right. We do not believe a detainee's  constitutional right to privacy is violated when he is segregated, given meals on foam trays, his activities are restricted, or those he is in close contact with are advised of his HIV positive status.   Detention center personnel have an obligation to take necessary measures for their own safety and the reasonable safety of other detainees.  *Cf. Powell v. Schriver*, 175 F.3d 107, 112-113 (2d Cir. 1999)(prison officials are permitted to impinge on confidentiality of previously undisclosed inmate medical information where actions are reasonably related to legitimate penological concerns).

Second, even if we assume the facts alleged establish the violation of a constitutional right, we do not believe this right was clearly established in 2005 when Richey was detained at the BCDC.   The Eighth Circuit takes a broad view of what constitutes clearly established law.  *See Winters v. Adams*, 254 F.3d 758, 767 (8th Cir. 2001).  To be clearly established "the right's contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001)(*quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).  While there "is no requirement that the very action in question [have] previously been held unlawful,

-39-

"in the light of pre-existing law the unlawfulness must be apparent." *Vaughn*, 253 F.3d at 1130 (citations and internal quotation marks omitted).

We do not believe Richey had any clearly established constitutional right to the non-disclosure of his HIV status. Although there are cases decided since *Tokar*, discussed above, that have held that a prisoner does have a right to privacy in his medical information. *See e.g., Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001); *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999). This right has not been held to be co-extensive to that of free citizens. *Id.* Instead, the right is subject to substantial restrictions. *Id.*

We note that in this case the only two named defendants are Dr. Mullins and Sheriff Ferguson. Richey does not attribute any of the alleged verbal disclosures to other inmates to the defendants. Dr. Mullins is not alleged to have been involved in any decisions related to Richey's housing, his meals, his requests for hair cuts or shaves, or when he was allowed recreation. Richey does not allege Dr. Mullins was responsible for the time sheet with the word AIDS written on it being posted outside Richey's cell. As such, Dr. Mullins cannot be held liable for any alleged constitutional violations related to these actions.

With respect to Sheriff Ferguson, Richey has not alleged that he had any personal interaction with the Sheriff or that the Sheriff was personally involved in any decisions regarding Richey's housing, his meals, his hair cuts or shaves, or when he was allowed to take recreation. There is nothing to suggest the Sheriff posted the AIDS sign outside Richey's cell, knew about the sign, directed that the sign be posted, or had any involvement in the posting of this sign or any other AIDS sign.

-40-

Official capacity claims against the defendants are the equivalent of a suit against Benton County. *See e.g., Grayson v. Ross*, 454 F.3d 802, 810 (8th Cir. 2006). "'[A governmental entity] may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional . . . policy or custom.'" *Reasonover v. St. Louis County*, 447 F.3d 569, 582 (8th Cir. 2006) (*quoting Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). *See also Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). "To establish liability, [the plaintiff] must prove a . . . custom or policy was the moving force behind the constitutional violation." *Reasonover*, 447 F.3d at 583. "A supervisor is not vicariously liable under [§ 1983] for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994). *See also Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990)(supervisors are not liable for claims brought under § 1983 on respondeat superior theory; supervisors must be personally involved in, deliberately indifferent to, or tacitly authorize constitutional violation).

In this case, Richey contends there was a policy of segregating HIV positive inmates from the general population that extended to virtually all aspects of daily life at the BCDC including how these inmates were given their meals and when they were allowed to take recreation. Richey maintains this segregation policy violates his constitutional rights. A segregation policy has been specifically upheld as a reasonable infringement of the right of privacy "in light of the inmate interest at stake . . . and the difficult decisions that the [prison officials] must make in determining how best to treat and control within [the] correctional facilities the spread of a communicable, incurable, always fatal disease." *Harris v. Thigpen*, 941 F.2d 1495, 1521 (11th

-41-

Cir. 1991).  We believe the acts that can be said to be attributed to these defendants were those designed to achieve legitimate correctional goals.

### Adequacy of the Grievance Procedure

Richey contends his grievances were not handled properly, he did not always receive responses to his grievances, and he did not always get copies of his grievances.  However, he has not identified a federal constitutional right that he was deprived of because of the alleged inadequacies in the BCDC's grievance procedures.  He makes no argument that his grievances were ignored because of his exercise of his First Amendment rights or that his ability to exercise any specific constitutional right was chilled by defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a . . . grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the . . . grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted).  *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).  A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Blagman*, 112 F. Supp. 2d at 542 (*citing, Scott v. Kelly*, 107 F. Supp. 2d 706 (E.D. Va. 2000), *aff'd*, 6 Fed. Appx. 187 (4th Cir. 2001)).  "Therefore, the refusal to process an inmate's grievance

-42-

or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV. 2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).

Richey submitted multiple grievances. *See Defts' Ex.* 1; *Plff's Ex.* 1. Although he was not always satisfied with the defendants' response, Richey received responses to the majority of the grievances. *Id.* The lack of a meaningful grievance procedure did not deprive Richey of access to the courts. Accordingly, this claim fails.

## CONCLUSION

For the reasons stated, I recommend the defendants' motion for summary judgment (Doc. 20) be granted in part and denied in part. Specifically, I recommend that the motion be granted with respect to plaintiff's claims that his right to privacy, or confidentiality, with respect to his medical information was violated and his claim that the grievance procedure was inadequate. I recommend that the motion for summary judgment be denied with respect to plaintiff's claim that he was denied adequate medical care.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of February 2007.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-43-