IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SCOTT JEFFERSON FOX RICHEY                                    PLAINTIFF

v.                          Civil No. 05-5162

DR. NEIL MULLINS; and
SHERIFF KEITH FERGUSON                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff contends he was denied adequate medical care while he was incarcerated at the

Benton County Detention Center (BCDC).  On June 26, 2007, an evidentiary hearing was held.

At the conclusion of the evidentiary hearing, the matter was taken under advisement.

The record was held open until the receipt of plaintiff's medical records from the

Arkansas Department of Correction (ADC) for the time period from January 2002 through June

of 2007; from St. Mary's Hospital for the time period July 17, 2005, to July 18, 2005; and from

Jefferson Comprehensive Care System, Inc., for the time period from January 2002 through June

of 2007.   Jefferson Comprehensive Care System, Inc., responded to the subpoena by advising

the court  that the plaintiff was only seen at the ADC by their physician Dr. Esterlita Quimosing

and no records were on file at their Community Health Center (Doc. 68).  The records from the

ADC and St. Mary's were received and are labeled *Count's Exhibits* 2 and 3.

## BACKGROUND

At the evidentiary hearing, the court heard the testimony of the following witnesses:  (1)

Dr. Linda McGhee; (2) Gary D. Thompson; (3) Joshua Potter; (4) Danny Lane; (5) Scott Richey;

-1-

(5) Sheriff Keith Ferguson; and (7) Dr. Neil Mullins.  For purposes of discussion, we will briefly

summarize in the first person the testimony given.

### Testimony of Dr. Linda McGhee

I'm a doctor.  I engage in family practice and HIV medicine.  I have been treating the

disease since 1983.  I trained by phone to treat HIV patients.  I work at the Washington County

HIV Clinic.

I last saw Richey on June 9, 2005.  At that time, I prescribed the following medications:

Sustiva 600 mg., once a day; Zerit 40 mg., twice a day; and Epivir 150 mg., twice a day; these

drugs directly suppress the virus and combat HIV; Bactrim once a day to prevent pneumonia and

toxoplasmosis a parasite that can invade the brain seen in people who have T-cell counts less

than 200; Klonopin 1 mg., twice a day, to prevent anxiety; Wellbutrin 150 mg. XL, once a day,

to treat depression; and Sporanox 100 mg., once a day to treat fungal infections.  He definitely

needed Sutiva, Zerit, Epivir, and Sporanox for HIV.

Richey had a fungus on his skin when I saw him in June.  I prescribed the Sporanox as

a treatment for an existing fungal infection.  The fungus can be anywhere from the brain to the

skin and goes along with HIV.

On July 29, 2005, the jail contacted the clinic about Richey.  *See Plaintiff's Exhibit* 1 at

page 4.  I called the jail and talked to Sue McDonald.  I believe this is the first time I had talked

to the BCDC about Richey.  I believe there was some contact with the BCDC in 2003–no that

was the Washington County Detention Center.  Richey has a long history of mental dysfunction.

A list of medications was faxed over.  *See  Defendants' Exhibits* 1 & 2.  My staff wrote

the words also needs Bactrim on defendants' exhibit 1.  However, no one on my staff wrote the

-2-

pricing contained on defendants' exhibit 2. It could be that two letters were sent. One may have been sent and then she noticed that Bactrim had been left off so she sent another one with the handwritten notation that Richey also needed Bactrim.

When I prescribed the medications to Richey, I felt he needed all the medications I prescribed when I saw him. I didn't see him after he entered the BCDC. I can't really say if it was improper to leave him on only the first three medications, Sustiva, Zerit, and Epivir.

Therapeutic drug interruptions are sometimes done on purpose. Plaintiff's virus was not totally suppressed but it was partially suppressed. At that point, I would have wanted to do a genotype and change the drugs to obtain better suppression.

With HIV patients, the standard is to do blood work every three to six months depending on how the patient is doing. Richey's blood work was done in June and then it was done again in December of 2005. In June, his viral load was 14,800 and his T-cell 142. *Plff's Ex.* 1 at pages 19-20. In December, his viral load was 32,086 and his T-cell 211. *Defts' Ex.* 3 at pages 2-3. The viral load number shows that in December the virus was not suppressed but the number is not astronomical–it is not alarming.

We can assume he took his medicine consistently while he was incarcerated. The lab results show the virus was at least partially suppressed.

A three week delay in a patient receiving his HIV medication is not a major problem. It sometimes takes that long to get drugs from companies or get funding for a patient.

When an HIV patient's T-cell count is less than 200, it is recommended that they be put on Bactrim to prevent pneumonia and toxoplasmosis. I don't believe Richey contracted pneumonia. Sporanox would have been helpful for Richey.

-3-

These are records from Premier Dermatology, Dr. Missy Clifton. *Defts' Ex.* 4 (Richey was seen on December 8, 2005). She diagnosed a superficial basal cell carcinoma and prescribed Efudex. *Id.* She also diagnosed early squamous cell carcinoma v. carbuncle and prescribed Bactrim double strength. *Id.* Her records also describe where the lesions are.

Dr. Clifton does not describe any fungus. She just gives a history that he has had fungus in the past. She was thinking he had skin cancer. Sporanox would not help with a skin cancer. Skin cancer is not related to HIV. It is very prominent in fair skinned people.

I gave Richey Sporanox in June because I noted a fungus. When the T-cell count goes up frequently the fungus will get better even without medication. A dermatologist should be an expert on the skin. Richey does have very sensitive and reactive skin.

I would like to offer this chart showing the trends in the rates of the leading cause of death. It covers the years 1987 to 2004. It was prepared by the Center for Disease Control. *Court's Exhibit* 1.

**Testimony of Gary D. Thompson**

I'm currently an Arkansas Department of Correction (ADC) inmate. I was in the BCDC in June of 2005.

I was in the medical pod with Richey. I remember him.

I remember Richey said he wasn't getting his Wellbutrin and Bactrim. His face was not getting any better. He had sores on his face that were raw and open. I don't remember them bleeding. He was sick.

-4-

I was personally denied access to the doctor and dentist.  I needed to see the dentist and was only put on Ibuprofen for thirty or forty-five days.  I honestly don't know if Richey saw the doctor.

### Testimony of Joshua Potter

I was in the BCDC during the same time Richey was.  I was his roommate for a while.

I remember him having a sore on his chest.  He got in the shower and then he was taken to the nurse's station and the sore was covered.  I remember he had something removed off his head.

### Testimony of Danny Lane

I have AIDS.  While I was in the BCDC, I had to supply my own medications.

I recall Richey being in there.  I was in the medical pod for two months.

I saw Richey get out of the shower with sores.  I saw him complain and write grievances almost daily.  I saw him bleeding and they gave him a band-aid.

I read an article where they were trying to get people with HIV to pay for their own medication.  I brought my own medication because they take awhile to get you set up on your medication.

### Testimony of Scott Richey

On July 17, 2005, I ran from the police and was arrested.  Once they arrested me I was taken to St. Mary's Hospital for treatment.  I had open bleeding wounds.  I said I was HIV positive and had Hepatitis C.  I have been HIV positive since 1990.

I was being treated at the Washington County HIV Clinic by Dr. Linda McGhee.  I had seen her in June.  She gave me the medicines I was on.  Stress can bring your levels up and

AO72A
(Rev. 8/82)

down.  I was mourning the over-dose death of my finance.  This is what lead to my arrest on July 17th.

I was then taken to the BCDC and processed in.  I was intoxicated at the time.  I never told them that I was HIV positive or had Hepatitis C.  However, the officers knew about my medical conditions from St. Mary's.

I was segregated at the BCDC.  I had mental problems with that.  I was fed on Styrofoam trays.  When I complained, they took away my blanket, towel, etc., and I was cold.  I felt like I was in a glass cage.  Sometimes I felt like I was on display.  They put on the sheet that I had AIDS.  They delayed getting me medical treatment.

Most of the time I was locked down in a cell by myself.  By accident they put Potter in my cell for a period of time.

I was observed and treated by Dr. Mullins.  He was not treating me like I was treated on the outside.  Dr. McGhee had developed a formula through trial and error.  I was booked in on July 17th.  I did not receive my HIV medication until August 11th.

I was seen by Dr. Mullins on July 19th.  *Defts' Ex.* 5 at page 1.  Dr. Mullins notes state I was in a motor vehicle accident a couple of days ago and my right eye was black and swollen shut.  *Id.*  I don't recall if I mentioned I was HIV positive to him but St. Mary's told them and Dr. McGhee told them I was in 2003.

On July 28th, I was seen again by Dr. Mullins.  *Defts' Ex.* 5 at page 2.  There is no mention of HIV.

On July 29th, McDonald received the letter from Dr. McGhee about my prescribed medications.  *Defts' Ex.* 1 & *Defts' Ex.* 2.  On August 11th, I was seen by Dr. Mullins and he

-6-

prescribed Sustiva, Zerit, and Epivir.  *Defts' Ex.* 5 at page 3.  I began receiving those the same day.  *Defts' Ex.* 7.

When medication is distributed, you are called out of your cell, you go up to the booking desk, one of the officers gives you your medicine, and you sign the medication log.  I never said I didn't get my medication once Dr. Mullins prescribed it on August 11th.  If there are days on the log it says I refused the medication, it is because I was in the shower, or asleep, or busy when they were doing "med call."  I didn't get any HIV medication until August 11th.  Even then, Dr. Mullins did not prescribe all the medication Dr. McGhee had me on.  He only prescribed three of the medications.

I did not get pneumonia.  However, with the HIV medicines, they don't want even a one day period where you don't get the medication.

On August 18th, I saw Dr. Mullins.  *See also Defts' Ex.* 5 at page 4.  He told me there were budgetary reasons for my not receiving the medication.  He said I think we are spending enough on you.  He put his professional opinion in his notes.  If you add the other medications up, you will up to another $1,000 a month.  I wasn't just talking about an anti-depressant.  He was going against my primary care physician.

On September 7th, I was seen by Dr. Mullins complaining of pain in my right shoulder, a rash on shoulder and forehead, and cold and sinuses.  *See also Defts' Ex.* 5 at page 5.  Dr. Mullins prescribed medications but they did not work.

On October 11th, I was seen by Dr. Mullins.  *See also Defts' Ex.* 5 at page 6.  I had a rash on my chest and some areas on my back.  I requested Sporanox.  Dr. Mullins prescribed something else and it didn't work.

-7-

On October 20th, I was seen by Dr. Mullins. *See also Defts' Ex.* 5 at page 7. The rash was not better. Dr. Mullins indicated he would try to find a dermatologist.

On December 20th, I was seen by Dr. Mullins. *See also Defts' Ex.* 5 at page 8. The rash appeared to be worse and was bleeding when I showered. Dr. Mullins stated he would consult with Dr. Clifton and see if I should continue the medicine or not.

On January 11, 2006, I went to the ADC. At this point, the sores were bleeding and getting worse.

I was seen by Dr. Mullins but he was not totally addressing my medical problems. I submitted grievances about this but Captain Petray sidestepped each grievance by just stating that the medical staff made all medical decisions.

Dr. Mullins saw I was getting upset. I realize I can't dictate what type of treatment I receive. However, when I have a doctor who has been treating me for years that treatment plan should be honored. I realize every county has a budget.

I should have received the blood work quicker. The blood tests were not done until a few days before I was taken to the ADC. Dr. McGhee was doing my blood tests every three months. Although she testified in general it is proper to do blood work in HIV patients every three to six months, she had been doing mine every three months. Since I've been at the ADC, they have changed my cocktail drugs.

Immediately upon my arriving at the ADC, they checked it out. The ordered my mental health medication, my cancer was treated, and my HIV treated.

### Testimony of Sheriff Keith Ferguson

I'm the chief law enforcement officer of the county and keeper of the jail. I develop the policies and procedures for the jail including those regarding health services. *See Defts' Ex.* 8.

I do not make medical decisions. The jail employs a nurse and doctor to make medical decisions. If there is an emergency, the staff might confer with me. The medical staff provides medical care, and we foot the bill.

We have to provide health care to all inmates. If inmates cannot afford to pay for their own medical care, we provide it. We pay for anywhere from $250,000 to $300,000 worth of medical expenses for inmates each year.

The medical expenses from January 1, 2005, through September of 2005, were $222,682.66. *Defts' Ex.* 9. This includes prescription medication, emergency room visits, supplies, over-the-counter medication, treatment by the doctor and nurse, and outside doctor visits.

We really have no option with respect to what the medical costs are going to be each year. It is not true that inmates are denied medical care or medication due to costs. The doctor gives the medical care and prescribed the medication he deems necessary in his professional opinion. We provide necessary medical care as ordered by the state regardless of cost.

I don't know the plaintiff. We have 400 to 500 inmates daily.

I believe if someone has a pre-existing condition, Benton County shouldn't have to pay for it. The individual should have to pay for it.

I can change policy. I don't see grievances. I have sergeants and other personnel to deal with grievances.

-9-

The policy in 2005 was that the Benton County Sheriff's Office paid for medical care. Since then, the policy has changed with respect to pre-existing conditions. We attempt to secure payment for medical care for pre-existing conditions from the detainees. If the detainees can't pay even if it is pre-existing, we pay. If the detainee can pay, they pay.

### Testimony of Dr. Mullins

From July 2005 to December of 2005, I had a private family practice and was also employed by Benton County. I had been employed by Benton County for ten years. I have been a doctor for thirty-seven years.

Since October 1, 2006, I no longer work for Benton County. It was a personal choice to no longer work there. I made the decision to cut down.

I made rounds at the BCDC in the morning. If there were problems, they called me. I saw between ten and twenty inmates each day.

The nurse screened requests and I would see the patients she thought I should see. She had the requests and inmate information. If I needed to see something, I could. I had access to the medical file when they came in.

On my notes the acronym S.O.A.P. stands for subjective or his complaint, objective, assessment, and plan or treatment. I dictated my notes immediately after seeing the patient before I would see the next patient.

I don't remember Richey's face but I do recall his case and the rash. On July 19th, I saw him because of contusions and abrasions to the face. I prescribed an anti-inflammatory medicine to take the swelling down. He did not tell me he was HIV positive. I had no clue. *Defts' Ex.* 5 at page 1.

-10-

He was seen four or five times before July 19th.  This is not in the notes.

I saw him again on July 28th for a recheck.  *Defts' Ex.* 5 at page 2.  He had multiple complaints about his shoulder but I could not document any problems from an examination.

I saw him on August 11th.  *Defts' Ex.* 5 at page 3.  We had received a letter from Dr. McGhee dated July 29th.  I didn't know how long she had been treating him.  I didn't feel she was telling me absolutely to place him on all of those drugs.

His only complaint was his shoulder.  He had no complaints about medication.  But now we had this letter.  So we put him on medication immediately.  I didn't see the necessity for the other drugs at that time--Sporanox, Wellbutrin, and Klonopin.  Had it been medically necessary I would have prescribed it.  The Sheriff has never limited me.  If I felt it was necessary I would have given it, money was absolutely not a consideration.

I never received a report from the nurse or guards that he was depressed.  I did an x-ray on his shoulder.  I tried to tell him we had a heart.  We were caring for him.  We were doing something.  We were prescribing medication.  I told him that it was subject to re-evaluation and we would prescribe the medication as needed.

I saw him again on September 7th.  *Defts' Ex.* 5 at page 5.  He complained of a pain in his right shoulder, a rash, and a cold and sinus.  *Id.*  I prescribed Triamcinolone Ointment, Ibuprofen, Erythromycin, and Deconamine.  *Id.*  I was going to recheck him in ten days.

Sporanox was usually used for fingernails and toes.  I had no experience with HIV.

On October 11th, Richey came in with multiple complaints.  *Defts' Ex.* 5 at page 6.  He wanted Sporanox for his fingernail.  He said he had thrush.  He had a dry area on his chest.

-11-

On October 20th, Richey had a rash on his left shoulder and a raised area on his forehead. *Defts' Ex.* 5 at page 7.  I decided to find a dermatologist.  I was able to locate a dermatologist who would see him, Dr. Missy Clifton.

On November 7th, Richey came in complaining that his liver was hurting him.  *Defts' Ex.* 5 at page 8.  I examined him and determined his liver was not enlarged and no treatment was necessary.

On December 20th, Richey came in asking that his rash be checked.  *Defts' Ex.* 5 at page 9.  He stated the rash got worse when he showered.  He was asked whether he should keep taking the medicine prescribed by Dr. Clifton.  I indicated I would talk to Dr. Clifton by phone.  I cannot recall if I did or not.

On December 27th, Richey came in for a recheck.  *Defts' Ex.* 5 at page 10.  He complained he was not getting his cream.  Dr. McGhee had ordered blood tests.  We evidently called Dr. McGhee's office and she told us what blood tests to order.  I prescribed oral solution for his mouth.

Richey never complained to me about not getting his HIV medication or not getting blood tests.  I saw him eighteen or twenty times.  Cost never came into what I prescribed.

Usually if an HIV positive detainee comes in, the jail or the nurse alerts me.  The notation on Richey's chart on July 19th that says "HIV +" looks like it is my writing.  *Defts' Ex.* 5 at page 11.  I believe the nurse writes in the dates to the far left on the chart.  Richey had denied before that he was HIV positive.

When an HIV positive patient came into the jail, we usually wait for the medical records.  If the patient was on medication, we would keep them on medication.

-12-

On July 19th, I must not have been satisfied in my mind he was an actual HIV patient. If I had taken it seriously, we would have taken steps.  I usually deferred to Dr. McGhee with respect to treatment of HIV patient.  In my practice, I do not treat HIV patients in my office.

Sporanox is a well known anti-fungal agent.  In her letter, Dr. McGhee didn't list Sporanox as one of the most important.

Richey's grievance dated August 11th, asks if his other medications that Dr. McGhee had him on are going to be honored and also asks when his blood work is going to be done.  *Plff's Ex.* 4.  Petray states he will forward the grievance to medical and the doctor makes the medical decisions in the jail.  *Id.*  I don't see the grievances.

Richey's right shoulder x-ray found no acute bony abnormality.  *Plff's Ex.* 2.  I examined range of motion and couldn't find any serious problems.

Richey's grievance dated July 26, 2005, mentions two issues related to his HIV status. *Plff's Ex.* 3. He mentions his T-cell count being low and his viral load high.  *Id.*

When Richey was arrested, I don't recall having any communication with St. Mary's. I don't recall being informed of Richey's HIV status on July 19th.

I dictate my notes.  The notes are transcribed and the tape is sent back to me and I use the same tape over again.

I treat some mental illness.  I am licensed to treat psychiatric illnesses.  People cuss me out a lot.

If you stop taking medication such as Wellbutrin, sometimes it causes problems.  It depends on the medication.  The first time it was brought to my attention that Richey had been

-13-

taking Wellbutrin was when we got the letter from Dr. McGhee.  Richey had been in the jail for sometime by then.

Richey mentions a rash in the August 11th grievance.  He mentioned he had the rash for a long time.  It wasn't a life threatening rash.  I try one or two things.  If they don't work, I send the patient to a specialist.

From July 17th to August 11th, Richey didn't have any medication.  Whether he suffered any long term or adverse affects in his long term prognosis, I would defer to Dr. McGhee.

### Records from the Arkansas Department of Correction–Court's Exhibit 2

Plaintiff asked the court to issue a subpoena for his medical records from the ADC for the time period from January of 2002 through June of 2007.  The court has received hundreds of pages of documents consisting of medical requests, dental records, records of visits to medical personnel, medication logs etc.  The copies produced were made from microfilm and a portion of the pages, particularly laboratory test result pages, are not legible.

These records indicate that on at least two other occasions Richey reported being off his HIV medications for several weeks.  On his intake physical in March 27, 2003, Richey reported being off his medication for three months because he could not get them at jail.  A note was made that the medication should be restarted and an appointment made with the HIV Clinic as soon as possible.

Lab results indicate there was a great fluctuation in Richey's T-cell count and viral load during 2004.  For instance, in August of 2004 his T-cell count was 165 and in October of 2004 it was 332.  In August of 2004 his viral load was 153,000 and in October of 2004 it had come down to 30,900.

-14-

On January 16, 2006, notations were made that Richey had lesions on his forehead and left chest. A note was also made that his last T-cell count was 200 and last viral load 25,000 per Richey's recollection.

Richey was seen by Dr. Esterlita Quimosing on February 8, 2006. She noted his T-cell count on January 20, 2006, was 428 and his viral load was 6,072. He was on Zerit, Epivir, and Sustiva. She noted his T-cell count and viral load were improving. She was going to repeat the blood tests in May. She discontinued the Sporanox.

On June 14, 2006, Richey was seen by Dr. Quimosing. He reported being on Zerit, Epivir, and Sustiva. However, he also stated that he had not been given the medications regularly while he was in confinement "x 30 days (3/8/06 →4/8/06)." She noted his T-cell count had been 428 on January 20, 2006, and his viral load 6,072 and his T-cell count was 163 on May 3, 2006, and his viral load 8998. She made the following notation: "therapeutic failure vs non-adherence." She was going to repeat the blood tests in June and if counts were not better, she was going to consider placing him on different HIV medications.

On July 19, 2006, Richey was seen by Dr. Esterlita Quimosing. She noted Richey's T-cell count was 457 and his viral load was 12,987. Richey was on Zerit, Epivir and Sustiva. She continued him on those medications but noted that she was considering placing him on Sustiva and Truvada. She planned to repeat his lab tests in October.

On October 11, 2006, Richey was seen by Dr. Quimosing. Dr. Quimosing noted Richey's T-cell count was 354 and his viral load was 14,282. She discontinued Zerit and Epivir and put him on Truvada. She also recommended a liver biopsy for possible interferon therapy.

On December 21, 2006, Richey's T-cell count was 249 and his viral load was 71,345.

-15-

Dr. Quimosing reviewed these results and continued him on Sustiva and Truvada.

On April 11, 2007, Richey was seen by Dr. Quimosing.  Dr. Quimosing noted Richey's T-cell count was 179 and his viral load was 20,664.  She continued Richey on Truvada, Sustiva, and Bactrim.  However, she indicated his prescription for Bactrim should be discontinued if his T-cell count was greater than 200 when the lab tests were re-done in July.

### Records from St. Mary's–Court's Exhibit 3

The records from St. Mary Rogers Memorial Hospital indicate Richey was admitted on July 17, 2005 at 11:14 p.m.  *Court's Exhibit* 3 at page 1.  Richey apparently ran from the police and was tackled.  *Id.* at 4.  He reported being HIV positive and having Hepatitis C.  *Id.*

He had a laceration on his forehead, bruises and swelling under his right eye, an abrasion on his right elbow, and a contusion on his right shoulder.  *Court's Ex.* 3 at pages 5, 10 & 13.  He refused sutures.  *Id.*  Richey was in police custody.  *Id.* at 10.

## DISCUSSION

From July of 2005 until October of 2005,  Richey was a pretrial detainee.  (Doc. 26 at page 16).  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted).  In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

-16-

"In order to state a cognizable claim [that he was denied adequate medical care, Richey must prove] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, he must "'show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere

-17-

negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239.  *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Richey maintains defendants exhibited deliberate indifference to his serious medical needs in the following ways:  (1) in failing to provide him with HIV medications between July 17th and August 11th; (2) in failing to prescribe all HIV medications listed by Dr. McGhee on her letter dated July 29th because of cost considerations; and (3) in failing to monitor his condition by ordering blood work every three months.

With respect to the delay in his receiving his HIV medications, we find no evidence of deliberate indifference on Dr. Mullins' part.  Richey testified he did not tell the booking officers or anyone else at the detention center when he was booked in that he was HIV positive.

Although Dr. Mullins saw Richey on July 19th and July 25th, there is no indication in Dr. Mullins' notes that Richey stated he was HIV positive or requested HIV medications. *Defts' Ex.* 5 at pages 1-2.  Although Richey testified the officers at St. Mary's knew he was HIV positive and the records from St. Mary's do reflect Richey was HIV positive, there is no indication Dr. Mullins saw these records or that this information was conveyed to him.

It appears Dr. Mullins did make a notation on the medical chart on July 19th that Richey was HIV positive.  Dr. Mullins testified he must not have been satisfied in his mind that Richey was an HIV positive patient or they would have taken steps.  In fact, Dr. Mullins testified that in the past Richey had denied that he was HIV positive.  At most, the evidence shows Dr. Mullins failed to appropriately follow-up and obtain the necessary medical records to verify Richey's HIV status.  This does not amount to deliberate indifference.

-18-

Furthermore, there is no evidence the delay in Richey receiving the medication from July 17th to August 11th had any effect on, or worsened, his medical condition. *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)("When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment. To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment ..."). Dr. McGhee indicated there are frequently delays in patients receiving their medication for a variety of reasons and sometimes patients are taken off medications for therapeutic reasons.

With respect to the HIV medications prescribed on August 11th, Dr. Mullins prescribed Sustiva, Zerit, and Epivir. *Defts' Ex.* 5 at page 3. He noted that Dr. McGhee's list mentioned these were the three most important medications. *Id.* He indicated the list also included Sporanox, Klonopin, and Wellbutrin. *Id.* He prescribed the three listed as most important and stated that he was not going to give Richey the other medicine that was for his behavior and would instead observe his behavior and see how he did. *Id.* Dr. Mullins' notes do not specifically address the Sporanox. *Id.* A second copy of the list that was faxed from Dr. McGhee's office included a notation that Richey also needed Bactrim.

We find no evidence of deliberate indifference on Dr. Mullins part with respect to the medications he prescribed. While Dr. Mullins may have erred in failing to prescribe the Sporanox, his error was based on his mistaken belief that this anti-fungal medication was not related to the treatment of HIV. This is insufficient to establish deliberate indifference. *Gibson*

*v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)("A showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions").

Furthermore, there is no indication Richey suffered any adverse health consequences as a result of not having the Sporanox.  When he did develop skin problems, Dr. Mullins tried various medications and when they did not work, Richey was sent to a dermatologist, Dr. Missy Clifton, who determined Richey had skin cancer.  Dr. McGhee testified the skin cancer was unrelated to Richey's HIV status and the Sporanox would not have been prevented Richey from developing the condition.

With respect to the Bactrim, Richey did not develop pneumonia or toxoplasmosis.  Dr. McGhee testified that when the T-cell count is above 200 the Bactrim could be discontinued.  When Richey's blood tests were done in December of 2005 his T-cell count was above 200.  Richey's ADC records also indicate that when his T-cell count was above 200 Dr. Quimosing discontinued his Bactrim prescription.

Finally, Richey maintains Dr. Mullins exhibited deliberate indifference in failing to order blood tests to check Richey's T-cell count and viral load on a more frequent basis.  Richey maintains the blood tests should have been done every three months.  The blood tests were done in June by Dr. McGhee and done again in December while he was incarcerated at the BCDC.  Dr. McGhee testified the guidelines for HIV positive patients were that blood tests should be done every three to six months.  The blood work was ordered within this guideline period and Dr. Mullins sought the advise of Dr. McGhee with respect to what blood tests needed to be ordered.  There is no evidence of deliberate indifference on Dr. Mullins' part.

-20-

With respect to Sheriff Ferguson, Richey contends Benton County's policy requiring detainees to pay their own medical care related to pre-existing conditions and/or its budgetary concerns caused him not to get his HIV medications.  However, to establish liability based on this custom or policy Richey must establish the custom or policy was the moving force behind the constitutional violation.  *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 583 (8th Cir. 2006).   "Before a municipality can be held liable . . . there must be an unconstitutional act by a municipal employee."  *Russell v. Hennepin County*, 420 F.3d 841, 846 (8th Cir. 2005).

First, we note there is no evidence Sheriff Ferguson was personally involved in making any decisions regarding Richey's medical care.  *See e.g., Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(general supervisory responsibility insufficient to establish personal involvement to support liability; where prison official was not involve in treatment decisions and lacked medical expertise and medical care inquiries were referred to medical unit the claim should have been brought against individual directly responsible for inmate's medical care).  Second, we note that Sheriff Ferguson testified that the policy in 2005, when Richey was incarcerated at the BCDC, was that Benton County paid for medical care for detainees whether or not the condition involved was pre-existing.  Finally, for the reasons discussed above, we do not believe the evidence establishes that Benton County's alleged budgetary concerns, assuming such concerns can constitute a custom or policy, was the moving force behind Dr. Mullins' decision not to prescribe Richey Sporanox or Bactrim.  *Avalos v. City of Glenwood*, 382 F.3d 792, 802 (8th Cir. 2004)("[A] municipality may be held liable for the unconstitutional acts of its officials or

-21-

employees when those acts implement or execute an unconstitutional municipal policy or custom").

## <u>CONCLUSION</u>

For the reasons stated, I recommend that judgment be entered in the defendants' favor and that this action be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of July 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-22-